IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 21-cr-00077-WJM

UNITED STATES OF AMERICA,

        Plaintiff,

v.

ANDY RICARDO ALVAREZ-GONZALEZ,
    a/k/a Andy Gonzalez-Alvarez,
    a/k/a Andy Alvarez,
    a/k/a Andy Gonzalez,
    a/k/a Andy Richard Alveraz-Gonzalez,
    a/k/a Silent,

        Defendant.

## MOTION FOR NON-GUIDELINE SENTENCE

The defendant, Andy Ricardo Alvarez-Gonzalez ("Mr. Alvarez"), by and through undersigned counsel, David Kraut, hereby respectfully moves the Court to grant a downward variance and impose a sentence of 30 months imprisonment followed by two years of supervised release.

The United States Probation Office determined Mr. Alvarez is subject to a guideline imprisonment range of 46-57 months based on a final offense level of 21 and criminal history category III. Neither party has objected to this calculation. The government has agreed to recommend a sentence not to exceed 40 months imprisonment and the U.S. Probation Office has identified that agreement as a factor that "may warrant a variance from the applicable sentencing guideline range." ECF 20, 29.

## FACTUAL BACKGROUND

For his first eight years, Mr. Alvarez and his two older siblings lived in Mexico City with their parents. When he was eight years old, Mr. Alvarez's life changed in two significant ways: first, his father abandoned the family, and second, shortly thereafter, his mother brought him and his siblings to the United States. With two exceptions, Mr. Alvarez has lived in the United States continuously since that time.

Without his father's financial support, Mr. Alvarez's mother could not support her children in Mexico. She and her two sons, then ages eight and nine, made the difficult and dangerous journey into the United States.[1] They initially settled with her sister-in-law in Aurora, Colorado, but moved at least five times over their first few years in Colorado. *Id*.

Mr. Alvarez attended Aurora and Adams County public schools between the 4th and 9th grades.[2] He learned English quickly, but struggled academically. Shortly after Mr. Alvarez dropped out of high school following the 9th grade, his father died. Though Mr. Alvarez learned of his father's death when it happened, the two had not had contact for more than seven years.

That year, Mr. Alvarez began experimenting with alcohol and marijuana and for the next two years, used marijuana daily. Between ages 15 and 16, he began associating with gang-affiliated peers, became gang-affiliated, and sustained two minor juvenile adjudications. *See* PSR (ECF 29), ¶¶ 28 (municipal disorderly conduct), 29 (misdemeanor theft).

A few months after turning 17, Mr. Alvarez was involved in an altercation with another 17 year-old boy during which Mr. Alvarez cut the other boy's leg with a knife. ECF 29, ¶30; ECF 26

---

[1] *See* Defense Investigator Interview Memorandum, Maria Gonzalez, Ex. A.
[2] *See* School Records, Ex. B.

at 2-3. Mr. Alvarez was arrested, charged, and convicted as an adult. The state court sentenced him to four years imprisonment within the Colorado Youth Offender System ("YOS"), a component of the Colorado Department of Corrections reserved for offenders who were under 20 at the time of the offense, under 21 at sentencing, and convicted as adults of certain serious crimes. *See* C.R.S. § 18-1.3-407, *et. seq.* During his sentence, Mr. Alvarez progressed through the program phases. The vast majority of correctional officer feedback describes Mr. Alvarez as a helpful, positive inmate who kept his unit and recreation yard clean and even helped staff manage difficult situations with other offenders.[3] He successfully completed his YOS sentence and was transferred directly into immigration custody upon release.

In April of 2014, Mr. Alvarez, then 21 years old, was deported to Mexico, where he knew very few people. He lived with his grandmother in Mexico City for over a year, working in a PVC pipe factory and as a roofer. In his free time, Mr. Alvarez practiced barbering and tattooing. He also began communicating with Elizabeth Rocha ("Ms. Rocha"), who he met prior to his YOS term.[4] In 2015, Mr. Alvarez returned to his family in the United States. His YOS community supervision period had expired, so he had no legal obligations relating to his assault case.

After returning to Colorado, Mr. Alvarez reconnected with Ms. Rocha. The two began dating and Mr. Alvarez moved in with her family in Greeley, where he worked as a painter. In 2016, Ms. Rocha became pregnant, and the couple moved into their own apartment in Aurora. On January 9, 2017, they had a son, Damien Alvarez-Rocha. Though never formally married, Mr. Alvarez and Ms. Rocha have been in a committed relationship for more than seven years and

---

[3] *See* Colorado Dept. of Corrections CHRONLOG, Ex. C.
[4] *See* Defense Investigator Interview Memorandum, Elizabeth Rocha, Ex. D.

consider themselves to be common-law married. Mr. Alvarez has always financially supported the family, mainly by working as a painter.

On September 20, 2018, police arrested Mr. Alvarez after discovering a handgun in his vehicle during a traffic stop. He was charged with possession of a weapon by a previous offender in state court, but released on bond days after his arrest. In November of 2018, while living with his wife and young son and in compliance with his bond conditions, Mr. Alvarez was arrested by immigration authorities and deported. He remained in Mexico for about one year, working at flea markets and barbershops, and sending as much money as he could to Ms. Rocha.

In late 2019, Mr. Alvarez returned to Colorado and immediately reunited with Ms. Rocha and their son in Aurora. On January 11, 2020, Aurora police contacted Mr. Alvarez during a traffic stop and discovered a warrant in his 2018 Denver case. After a week in custody, Mr. Alvarez was released on bond. Immigration authorities did not arrest him. He returned to his and Ms. Rocha's home in Aurora and again, complied with his bond conditions, attending court six times between February 24 and August 28, 2020.[5] On August 28, 2020, Mr. Alvarez pled guilty to possession of a weapon by a previous offender and the Denver District Court sentenced him to two years of probation with no imprisonment.

For about six months, Mr. Alvarez did well. He continued to work as a painter, supported his wife and son, and complied with his probation conditions. Unfortunately, on the date of the instant offense, he drank alcohol during a family party at his mother's Aurora apartment. Mr. Alvarez and his brother, Luis Alvarez-Gonzalez, began arguing about the dynamic between their

---

[5] Several of these appearances occurred by video teleconference due to the COVID-19 pandemic. *See* Denver 18CR7187 Docket Sheet, attached as Ex. E.

mother and her boyfriend. In short, the brothers agreed that their mother's boyfriend did not treat their mother well, but Andy criticized Luis for failing to protect their mother from the boyfriend while Luis felt Andy had no right to complain about events that occurred while he was locked up or in Mexico. Both brothers were intoxicated and said hurtful things. While storming out of the apartment in the heat of this argument, Mr. Alvarez fired a handgun into the ceiling above the front doorway. Luckily, no one was injured. He did not fire at anyone or attempt to shoot anyone, but he recognizes he shouldn't have had a gun at all, and even worse, his actions created a risk of serious injury to anyone who may have been in the apartment above. He walked alone to his wife's car in the parking lot in an effort to calm down. While he moved the car to an overnight parking spot, officers contacted him, removed him from the car, and found the gun in the car.

Officers arrested Mr. Alvarez around 2:15 am on February 14, 2021 and booked him into the Denver jail on state charges for possession of a weapon by a previous offender and illegal discharge of a firearm.[6] On February 15, 2021, he posted a $1,000 bond and returned home. On March 3, 2021, Mr. Alvarez appeared as required in state court and remained on bond. The government indicted him in this case on March 17, 2021 and federal agents arrested him on this warrant on March 19, 2021. On March 25, 2021, the Denver District Attorney's Office dismissed the state prosecution based on these events.

## LEGAL AUTHORITY AND ARGUMENT

"A sentence above or below the recommended Guidelines range through application of the sentencing factors in 18 U.S.C. §3553(a) is called a 'variance.'" *United States v. Pinto-Padilla*, 315 Fed. Appx. 718, 722 (10th Cir. 2009) (internal citation omitted). In determining whether to

---

[6] Denver District Court Case No. 21CR1025.

grant a downward variance, "'no limitation shall be placed on the information' a sentencing court may consider 'concerning the [defendant's] background, character, and conduct.'" *United States v. Tena-Arana*, 738 Fed. Appx. 954, 961 (10th Cir. 2018) (quoting 18 U.S.C. §3661 and *Pepper v. United States*, 562 U.S. 476, 488 (2011)).

While it is true that "a variance is appropriate if a guideline calculation fails to meet the sentencing objectives outlined in §3553," a court may not read §3553 in a way that "unduly restrict[s] the scope of information a sentencing court may consider" as a potential basis for a downward variance. *Tena-Arana*, 738 Fed. Appx. at 962 (appellate waiver may support downward variance because appellate waivers concern and relate to objectives and factors in §3553); *see also Pepper*, 562 U.S. 476 (post-sentencing rehabilitation may support downward variance); *United States v. Smith*, 756 F.3d 1179, 1181, 1184 (10th Cir. 2014) ("sentencing courts may examine and consider the impact of contemporaneously issued sentences" and "most any other salient fact about a defendant.").

A downward variance is appropriate in this case for several reasons. First, although § 2K2.1 does not provide for a downward departure based on cultural assimilation, the commentary to §2L1.2 does. Section 2L1.2 does not directly apply in this case because Mr. Alvarez's illegal reentry charge will be dismissed. However, varying downward based on Mr. Alvarez's cultural assimilation would be consistent with the Sentencing Commission's policy statements.

Application note 8 of the commentary to § 2L1.2 states:

> 8. **Departure Based on Cultural Assimilation.**—There may be cases in which a downward departure may be appropriate on the basis of cultural assimilation. Such a departure should be considered only in cases where (A) the defendant formed cultural ties primarily with the United States from having resided continuously in the United States from childhood, (B) those cultural ties provided the primary motivation for the defendant's illegal reentry or continued presence in the United

> States, and (C) such a departure is not likely to increase the risk to the public from further crimes of the defendant.
>
> In determining whether such a departure is appropriate, the court should consider, among other things, (1) the age in childhood at which the defendant began residing continuously in the United States, (2) whether and for how long the defendant attended school in the United States, (3) the duration of the defendant's continued residence in the United States, (4) the duration of the defendant's presence outside the United States, (5) the nature and extent of the defendant's familial and cultural ties inside the United States, and the nature and extent of such ties outside the United States, (6) the seriousness of the defendant's criminal history, and (7) whether the defendant engaged in additional criminal activity after illegally reentering the United States.

USSC §2L1.2, comment. (n.8). Mr. Alvarez meets all three criteria set forth in the first paragraph of the comment and five of the seven factors listed in the second paragraph would support a downward departure. The sixth and seventh factors (seriousness of criminal history and criminal activity after illegal reentry) weigh against a downward departure for Mr. Alvarez, but do not outweigh Mr. Alvarez's genuine cultural assimilation. On the whole, this guideline commentary lends support for a downward variance based in part on Mr. Alvarez's cultural assimilation.

Second, Mr. Alvarez's deportation will provide significant punishment for this offense. Following his deportation, his wife and son plan to remain in Colorado, but hope to visit him as much as possible. As Ms. Rocha explained, travel between Colorado and Mexico is so expensive and time consuming that she expects they will only visit once a year. Mr. Alvarez, who has spent almost none of his adult life in Mexico, will need to find steady work and safety, basic necessities that will be hard to secure. These considerable challenges will create stress for the entire family. Even if successful, this plan will not allow Mr. Alvarez to continue to serve as the present father he has been for most of Damien's life. The most important relationships in his life are with Ms.

Rocha and Damien. Hopefully, his deportation will not end those relationships, but it will profoundly change and strain them.

Third, Mr. Alvarez has accepted responsibility for his behavior by pleading guilty in a timely manner in this case. He recognizes the danger his actions created and regrets his offense conduct. His guilty plea and thirty-month sentencing request reflect the sincerity of his remorse and understanding of the need to avoid future similar conduct.

Finally, Mr. Alvarez's personal history and characteristics demonstrate a consistent drive to overcome adversity. As an eight-year-old child, he lost his relationship with his father, endured multiple dangerous trips between Mexico and the United States, and lacked a steady residence for several years. When he was fifteen, his father died before they had the opportunity to reestablish their relationship. After several years surrounded by recreational drugs and negative influences, he landed in Colorado's adult prison system for his first felony offense, a crime he committed as a juvenile. Following this painful experience, Mr. Alvarez was immediately deported to Mexico and separated from his mother and siblings. With the support of his grandmother, he survived in Mexico, but struggled. He returned to the United States to reconnect with his family and pursue a relationship that grew into his current marriage. Once back in Colorado, Mr. Alvarez became a father, a privilege that has been the highlight of his life. Despite several forced separations between Mr. Alvarez and his wife and son, he has worked consistently to support them and maintained strong relationships with them.

## CONCLUSION

In light of Mr. Alvarez's personal history, the circumstances surrounding his decision to return to the United States after deportation, and his remorse for the impulsive conduct at the center

of this case, a sentence of thirty months, followed by two years of supervised release, is sufficient, but not greater than necessary, to satisfy the statutory goals of sentencing. For the reasons stated herein, Mr. Alvarez respectfully requests such a sentence.

Respectfully submitted,

VIRGINIA L. GRADY
Federal Public Defender


*s/ David Kraut*
DAVID KRAUT
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone:     (303) 294-7002
FAX:              (303) 294-1192
Email:            David_Kraut@fd.org
Attorney for Defendant

CERTIFICATE OF SERVICE

I hereby certify that on February 2, 2022, I filed the foregoing **MOTION FOR NON-GUIDELINE SENTENCE** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following e-mail address:

Albert Buchman, Assistant United States Attorney
E-mail:  al.buchman@usdoj.gov

I hereby certify that I have mailed or served the document or paper to the following participant in the manner (mail, hand-delivery, etc.) indicated next to the participant's name:

Andy Ricardo Alvarez-Gonzalez (via U.S. mail)

                                            *s/ David Kraut*
                                            DAVID KRAUT
                                            Assistant Federal Public Defender
                                            633 17th Street, Suite 1000
                                            Denver, CO  80202
                                            Telephone:     (303) 294-7002
                                            FAX:               (303) 294-1192
                                            Email:             David_Kraut@fd.org
                                            Attorney for Defendant